PD

William X Nietzche [aka WILLIAM KINNEY III]
Julie Ann Metcalf Kinney
c/o P.O. Box 12005
Portland, Oregon [97212]

FILED 4TH JUDICIAL DIST.
2026 MAR 19 PM3:54

## IN THE CIRCUIT COURT OF THE STATE OF OREGON
## FOR THE COUNTY OF MULTNOMAH

26CV13410

| Case No. _____ |

AMOUNT IN CONTROVERSY; EXCEEDING $50,000
PRAYER: TBD BY JURY
NOT SUBJECT TO MANDATORY ARBITRATION; ORS 21.160(2)(d)

WILLIAM X NIETZCHE [aka WILLIAM KINNEY III], an individual;

JULIE ANN METCALF KINNEY, an individual; and

THE ESTATE OF WILLIAM KINNEY JR., by and through its
Personal Representative, Julie Ann Metcalf Kinney,

     Plaintiffs,

v.

CITY OF PORTLAND, a municipal corporation;

TED WHEELER, in his individual and official capacity;

PORTLAND POLICE BUREAU;

MULTNOMAH COUNTY SHERIFF'S OFFICE;

JOHN PEMBERTON, an individual;

SELF ENHANCEMENT, INC., an Oregon non-profit corporation;

TONY HOPSON, an individual;

LIBRA FORDE, an individual;

SAM DIAZ, an individual;

SERAPHIE ALLEN, an individual;

KRISTEN DENNIS, an individual;

ROBERT TAYLOR, an individual;

TIM HICKS, an individual; and

DOES 1-10,

     Defendants.

Verified Correct Copy of Original 3/20/2026.

26CV13410

Verified Correct Copy of Original 3/20/2026.

| Case No. _

| **VERIFIED COMPLAINT** |

| (1) Negligence; (2) Intentional Infliction of Emotional Distress; (3) Trespass; (4) Conversion; (5) Fraud; (6) Civil Conspiracy; (7) Unjust Enrichment; (8) Constructive Trust; (9) Nuisance; (10) Wrongful Death |

| **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. This action arises from the City of Portland's use of unlawful, armed force to evict a Black and Indigenous family from their generational home in violation of a statewide eviction moratorium, as part of a decades-long policy to clear the Albina neighborhood for redevelopment.

2. To complete this displacement, City officials conspired with a City-funded non-profit, Self Enhancement, Inc. ("SEI"), to fraudulently acquire the family's adjacent lot and property through false promises and coercive pressure, including inducing Plaintiffs to dismiss a pending lawsuit against the adjacent property owner (BCMC Properties LLC) in Multnomah County Circuit Court Case No. 21CV04560.

3. The conspiracy is ongoing. As recently as January 29, 2026, a City agent offered to purchase the Kinney property at an "accelerated price" on behalf of the City. SEI continues to hold the adjacent lot and threatens to build a five-story development to render the Kinney home unlivable. The City continues to receive Tax Increment Financing (TIF) revenues directly attributable to the displacement of original landowners like Plaintiffs.

4. On March 2, 2026, City Attorney Robert Taylor formally terminated all negotiations, stating: "At this point, the City is not interested in the approach you've outlined. At the conclusion of the mediation, the City believes the parties are too far apart to make continued negotiations useful." A true and correct copy of said email is attached as **Exhibit C-1**. With the termination of negotiations, Plaintiffs' only remaining avenue for redress is this lawsuit.

5. Plaintiffs seek damages for the unlawful evictions, disgorgement of profits unjustly obtained by the City and SEI, imposition of a constructive trust upon the adjacent lot fraudulently transferred to SEI, and an injunction preventing the defendants from rendering the Kinney home uninhabitable.

Verified Correct Copy of Original 3/20/2026

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter pursuant to ORS 14.030 and ORS 46.044. The claims arise under Oregon common law and Oregon Revised Statutes, including but not limited to ORS chapter 30 (Tort Claims Act), ORS chapter 31 (Tort Actions), and ORS chapter 105 (Property Rights).

7. Venue is proper in Multnomah County Circuit Court under ORS 14.030 because a substantial part of the events giving rise to the claims occurred in this county, and all Defendants reside or transact business within this county or are subject to personal jurisdiction herein.

## PARTIES

### A. Plaintiffs

8. WILLIAM X NIETZCHE [aka WILLIAM KINNEY III] is domiciled in Multnomah County, Oregon. He is an enrolled member of the Upper Skagit Indian Tribe, a federally recognized Native American tribe. His enrollment is documented by his tribal enrollment card, a true and correct copy of which is attached as **Exhibit A** and incorporated herein. He is a beneficiary of the Kinney Family Trust.

9. JULIE ANN METCALF KINNEY is domiciled in Multnomah County, Oregon. She is an enrolled member of the Upper Skagit Indian Tribe. Her enrollment is documented by her tribal enrollment card, attached as **Exhibit A**. She is the Personal Representative of the Estate of William Kinney Jr. and Trustee of the Kinney Family Trust.

10. MICHELE METCALF is domiciled in the State of Washington and is an enrolled member of the Upper Skagit Indian Tribe. Her enrollment is documented by her tribal enrollment card, attached as **Exhibit A**. Although residing out of state during the events in question, she is a lifelong beneficiary of the Kinney Family Trust, grew up in the Kinney home, and has a vested equitable and emotional interest in the Property. She suffered actual damages including lost wages, travel expenses, and emotional distress.

11. MICHAEL KINNEY is domiciled in Multnomah County, Oregon. He is an enrolled member of the Upper Skagit Indian Tribe. His enrollment is documented by his tribal enrollment card, attached as **Exhibit A**. He was residing at the Kinney home at the time of the unlawful evictions and suffered direct physical, emotional, and financial harm.

12. THE ESTATE OF WILLIAM KINNEY JR. is represented by its Personal Representative, Julie Ann Metcalf Kinney. William Kinney Jr. was the family patriarch and owner of the Kinney home. His death was directly and proximately caused by the stress, trauma, and instability resulting from Defendants' unlawful conduct.

Verified Correct Copy of Original 3/20/2026.

## B. Defendants

13. CITY OF PORTLAND is a municipal corporation organized under the laws of Oregon, subject to suit under the Oregon Tort Claims Act, ORS 30.260 et seq.

14. TED WHEELER was the Mayor of the City of Portland. He is sued in his individual capacity for his own wrongful acts and in his official capacity as a final policymaker for the City.

15. PORTLAND POLICE BUREAU ("PPB") is a division and instrumentality of the City of Portland.

16. MULTNOMAH COUNTY SHERIFF'S OFFICE ("MCSO") is a law enforcement agency of Multnomah County, Oregon, subject to suit under ORS 30.260 et seq.

17. JOHN PEMBERTON is a Sheriff's Deputy with MCSO. At all relevant times, he acted within the scope of his employment.

18. SELF ENHANCEMENT, INC. ("SEI") is an Oregon non-profit corporation that receives millions of dollars in grants and contracts from the City of Portland. It is the successor-in-interest to the adjacent lot at 4424 N. Mississippi Avenue.

19. TONY HOPSON is an individual and an executive/agent of SEI. He participated in the fraudulent inducement, made false partnership promises, and directed coercive pressure against Plaintiffs.

20. LIBRA FORDE is an individual and an executive/agent of SEI. She directly articulated the fraudulent inducement scheme and stated SEI's race-based housing policy.

21. SAM DIAZ is an individual and was a housing policy advisor for the City of Portland Mayor's Office. He acted within the scope of his employment.

22. SERAPHIE ALLEN is an individual and was a Senior Policy Advisor to the Mayor of Portland. She acted within the scope of her employment.

23. KRISTEN DENNIS is an individual and was Chief of Staff to Mayor Ted Wheeler. She acted within the scope of her employment.

24. ROBERT TAYLOR is an individual and an attorney for the City of Portland. He acted within the scope of his employment.

25. TIM HICKS is an individual and a City-hired mediator who acted as the City's agent. At all relevant times, he acted within the scope of his agency.

26. DOES 1-10 are individuals and entities whose identities are presently unknown but who participated in the unlawful acts alleged.

## FACTUAL ALLEGATIONS

### SECTION I: THE KINNEY FAMILY AND THE CITY'S ONGOING POLICY CONTEXT

27. The Kinney family property at 4406 N. Mississippi Avenue (the "Property") has been owned and occupied by the Kinney family for generations. It is the last remaining Black and Indigenous-owned home in a neighborhood systematically targeted for demographic change through urban renewal.

28. Plaintiffs William X Nietzche, Julie Ann Metcalf Kinney, Michele Metcalf, and Michael Kinney are enrolled members of the Upper Skagit Indian Tribe, a federally recognized Native American tribe. Their enrollment is documented by tribal enrollment cards attached as **Exhibit A.**

29. The Property is located within the Interstate Corridor Urban Renewal Area ("ICURA"), a City of Portland urban renewal district created in 2000. The ICURA is funded through Tax Increment Financing ("TIF"), which diverts property tax revenue from increases in assessed value within the district into a dedicated fund controlled by the City's urban renewal agency, Prosper Portland.

30. The City's financial interest in maximizing TIF revenues creates a powerful incentive to facilitate displacement and land consolidation within the ICURA. The City continues to receive TIF revenues today, each dollar of which constitutes ongoing unjust enrichment at Plaintiffs' expense.

31. Between 2018 and 2021, the City Council adopted multiple ordinances increasing the ICURA's maximum indebtedness and allocating millions of dollars for property acquisition and redevelopment within the district, including:

    a. On or about June 13, 2018, Ordinance No. [XXXXX], allocating [$XX million] in TIF revenues for property acquisition within the ICURA;

    b. On or about December 16, 2020, Ordinance No. [XXXXX], increasing the ICURA's maximum indebtedness by $67 million and earmarking $19 million for the Williams & Russell Development Project;

    c. In January 2021, unanimous adoption of the Thirteenth Amendment to the ICURA Plan over public objection.

True and correct copies of said ordinances are attached as **Exhibits AA1, AA2, AA3** and incorporated herein.

32. The Williams & Russell Development Project—a public-private partnership to redevelop the "Hill Block" at N. Williams and N. Russell—involves redeveloping land acquired through the historical displacement of Black families, using TIF funds and public-private partnerships, while excluding displaced families from meaningful participation.

_Verified Correct Copy of Original 3/20/2026._

33. This same policy paradigm was applied to Plaintiffs' property and continues to be applied today through the City's ongoing coordination with SEI and its refusal to abate code enforcement fines.

## SECTION I-A: THE INTERSTATE CORRIDOR URBAN RENEWAL PLAN'S EXPRESS INCORPORATION OF THE ALBINA COMMUNITY PLAN

34. The Interstate Corridor Urban Renewal Plan (the "ICURA Plan"), adopted by the City Council in August 2000 and amended and restated through July 27, 2011, is the operative governing document for the ICURA, in which Plaintiffs' Property at 4406 N. Mississippi Avenue is located. Relevant excerpts from the ICURA Plan are attached as **Exhibit HH** and incorporated herein.

35. **The ICURA Plan expressly adopts and incorporates the Albina Community Plan as its foundational policy document.** Section 5 of the ICURA Plan, titled "Albina Community Plan," states in pertinent part:

> "The Albina Community Plan and its associated neighborhood plans, adopted by Council in 1993, will serve as the **cornerstone for this Plan.** Specifically, the Albina Community Plan will be the framework plan for the Area, recognizing that the specific urban renewal implementation measures will be sufficiently flexible to evolve in response to new challenges and opportunities as they arise." (ICURA Plan at 6) (emphasis added).

36. The Albina Community Plan referenced in the ICURA Plan is the same planning document whose accompanying 1988 Comprehensive Planning Map (**Exhibit J**) specifically designated the block containing the Kinney family property for conversion to a "Commercial Node." The 1993 Albina Community Plan was built upon the 1988 planning process and map. Relevant excerpts from the 1993 Albina Community Plan confirming its relationship to the 1988 planning process are attached as **Exhibit II.**

37. By expressly adopting the Albina Community Plan as its "cornerstone" and "framework plan," the City of Portland codified into its operative urban renewal policy the very land use objectives—including the conversion of residential properties like the Kinney home to commercial use—that form the basis of Defendants' campaign to dispossess Plaintiffs.

38. **The ICURA Plan contains explicit promises to protect residents like Plaintiffs.** Section 2 of the ICURA Plan, titled "Benefit the Existing Community/Equity," states in pertinent part:

> "This Plan will primarily benefit existing residents and businesses within the Area through the creation of wealth, revitalization of neighborhoods, expansion of housing choices, creation of business and job opportunities, provision of transportation linkages, **protection of residents and businesses from the threats posed by gentrification and displacement,** and through the creation and enhancement of those features which enhance the quality of life within the Area. A special emphasis will be placed on providing timely benefits to groups most at

_Verified Correct Copy of Original 3/20/2026._

risk of displacement (e.g., **the elderly, people of color**, small businesses, low-income people, the disabled)." (ICURA Plan at 5) (emphasis added).

39. Plaintiffs—as existing residents, people of color (Black and Indigenous), and a family whose patriarch was elderly—are the **expressly intended beneficiaries** of the ICURA Plan's protections against displacement. The City's unlawful eviction of Plaintiffs on September 9 and December 8, 2020, its fraudulent scheme to acquire their property through SEI, its ongoing weaponization of code enforcement fines, and its coordination with SEI to develop the adjacent lot in a manner designed to render the Kinney home uninhabitable constitute a direct and fundamental breach of the City's own adopted policies.

40. The ICURA Plan's promise to "primarily benefit existing residents" and its "special emphasis" on protecting "people of color" from displacement creates an affirmative obligation that the City has knowingly, intentionally, and repeatedly violated with respect to Plaintiffs.

41. The City's ongoing receipt of TIF revenues from the ICURA, while simultaneously engaging in conduct that displaces the very residents the Plan was designed to protect, constitutes unjust enrichment. Each dollar of TIF revenue derived from increased property values within the ICURA—increases driven in part by the displacement of original landowners like Plaintiffs—is a dollar obtained in direct contravention of the Plan's core equity provisions.

42. These provisions remained in full force and effect at all times relevant to this Complaint, including during the 2020 evictions, the 2021-2022 fraudulent conveyance scheme, the 2023 coerced repurchase, the 2024-2025 bad-faith negotiations, and the 2025-2026 expedited zoning approvals and coercive purchase offers. The City's conduct therefore represents not an aberration, but the intentional subversion of its own declared policies for the benefit of developers and at the expense of the protected class the policies were designed to serve.

**SECTION II: HISTORICAL CONTEXT AND DEFENDANTS' PRIOR BAD ACTS**

43. The 1988 Albina Community Plan and the Comprehensive Planning Map attached as **Exhibit J** are further evidence of this longstanding policy. Said map specifically designated the block containing the Kinney family property at 4406 N. Mississippi Avenue for conversion to a "**Commercial Node.**"

44. Plaintiffs reference this history and Exhibit J not to assert any claim arising from events prior to 2020, but for the following limited, permissible purposes:

> a. To provide necessary context for understanding Defendants' recent, unlawful acts against Plaintiffs;

_Verified Correct Copy of Original 3/20/2026._

b. To establish Defendants' motive and intent in their 2020-2026 campaign to dispossess Plaintiffs, negating any claim by Defendants that their conduct was an innocent mistake, bureaucratic error, or aberration;

c. To demonstrate that the 2020 evictions, the "two-step" scheme with SEI, the fraudulent conveyance, the expedited zoning under SB 1537, and the ongoing coercive pressure are the foreseeable and intended execution of a decades-old official City policy;

d. To provide direct evidence of the discriminatory animus motivating the conspiracy; and

e. To demonstrate that the City's own operative policy document—the ICURA Plan—expressly adopted the Albina Community Plan as its "cornerstone" and promised to protect "people of color" from displacement, thereby establishing that Defendants' conduct was a breach of the City's own codified commitments.

**SECTION III: THE UNLAWFUL EVICTIONS (SEPTEMBER 9 & DECEMBER 8, 2020)**

45. In 2004, the Kinney family was targeted for a predatory, subprime refinance loan on the Property. Following a non-judicial foreclosure, a third-party purchaser acquired the Property, and forcible entry and detainer (FED) proceedings were initiated.

46. On September 9, 2020, Oregon's COVID-19 eviction moratorium (House Bill 4213) was in full force and effect, along with a state-declared emergency due to wildfires. The moratorium prohibited law enforcement from executing writs of restitution for non-payment. Documentation of the eviction moratorium in effect on said date is attached as **Exhibit BB1**, confirming that Defendants acted with knowledge that the eviction was unlawful. A true and correct copy of the writ of restitution purportedly authorizing said eviction is attached as **Exhibit BB2**.

47. Despite actual notice of the moratorium, Defendants MCSO and Deputy John Pemberton executed a forcible eviction at the Property.

48. During this eviction:

a. Defendants broke down the door to the Property, as documented in photographs attached as **Exhibit C**;

b. Officers held family members, including Plaintiff Michael Kinney, at gunpoint, as documented in incident reports attached as **Exhibit B**;

c. Plaintiff Michael Kinney was unlawfully arrested and detained, as documented in **Exhibit B**;

d. Plaintiff William X Nietzche was unlawfully arrested and detained, as documented in **Exhibit B**;

Verified Correct Copy of Original 3/20/2026.

e. Plaintiff Julie Ann Metcalf Kinney was forced at gunpoint to hurriedly gather and remove personal items while other family members were detained.

49. Plaintiffs were given minutes to gather their belongings and were rendered homeless.

50. Following the September 9 eviction, Plaintiff William X Nietzche sought permission to camp on the vacant adjacent lot owned by non-party BCMC Properties LLC, located at 4424 N. Mississippi Avenue (the "Adjacent Lot").

51. On or about September 21, 2020, BCMC's manager granted explicit permission for Plaintiff Nietzche to reside on the Adjacent Lot, stating: "I got you"; "I'm with you." This created a tenancy at will under ORS 91.050. Written documentation of said permission is attached as **Exhibit I**.

52. On December 8, 2020, the state eviction moratorium remained in effect. Nevertheless, Defendants PPB and MCSO conducted a coordinated ambush raid on both the Property and the Adjacent Lot. The incident report documenting said raid is attached as **Exhibit D**.

53. During this raid:

a. Officers used excessive force;

b. Defendants destroyed Plaintiffs' personal property valued at over $10,000;

c. Defendants destroyed a sacred Native American crystal necklace belonging to Plaintiff Julie Ann Metcalf Kinney, which held deep religious and familial significance connecting her to her late Native American grandmother. A photograph of said sacred necklace taken before its destruction is attached as **Exhibit F**;

d. Plaintiff William X Nietzche's wedding ring was lost during the raid and never recovered. A photograph of Plaintiff Nietzche's wedding ring is attached as **Exhibit G**;

e. Plaintiff Michael Kinney was unlawfully arrested;

f. Plaintiff William X Nietzche was unlawfully arrested.

54. The destruction of the Property included:

a. Breaking the toilet and leaving human feces inside;

b. Destroying the bathroom sink and kitchen sink;

c. Damaging electrical systems;

d. Breaking doors, frames, and windows;

e. Damaging plumbing;

Verified Correct Copy of Original 3/20/2026.

f. Tearing down the Kinney family's cedar perimeter fence, which cost approximately $10,000 to install.

Photographs documenting the destruction of the Property are attached as **Exhibit E.**

55. This destruction rendered the Property uninhabitable and caused profound emotional distress to the entire Kinney family.

56. As a direct result of the unlawful displacement, the Kinney family was forced to place their salvaged belongings into three separate storage units, incurring over $10,000 in storage costs over four years. Storage facility receipts and invoices documenting said costs are attached as **Exhibit H**.

57. The severe stress, trauma, and instability caused by the unlawful evictions directly and proximately exacerbated the health of family patriarch William Kinney Jr. His subsequent death was a foreseeable consequence of the physical and emotional devastation wrought by Defendants' conduct.

## SECTION IV: THE CONSPIRACY TO TAKE THE PROPERTY (THE "TWO-STEP" SCHEME)

### A. The City's False Promises and Introduction of SEI (December 2020)

58. Following the December 8, 2020 raid, City officials Sam Diaz, Seraphie Allen, and Kristen Dennis initiated negotiations with Plaintiffs.

59. On December 9, 2020, Sam Diaz promised Plaintiffs: "We're in a holding pattern... We've signaled to the police chief... hold off... We want to support your goal... purchase of this property in your name." Written communications from Sam Diaz containing said promises are attached as **Exhibit L**.

60. Diaz, Allen, and Dennis promised to help abate over $60,000 in code enforcement fines that had accrued against the Property and to provide resources for repairing the damage caused by law enforcement.

61. On December 11, 2020, Seraphie Allen unveiled the City's plan: a "two-step" transaction where a non-profit would buy the home from the third-party owner, and Plaintiffs would later repurchase it from the non-profit. Allen indicated the designated non-profit was Self Enhancement, Inc. (SEI). Plaintiffs' contemporaneous notes from the December 11, 2020 meeting are attached as **Exhibit M**.

62. This "two-step" scheme was specifically designed to evade legal requirements governing municipal property acquisition, including competitive bidding protocols, public expenditure approvals, and transparency mandates under the City Charter and Oregon public contracting laws.

## B. Plaintiffs' Reliance on the City's Promises

63. In reasonable reliance on the promises made by City officials Diaz, Allen, and Dennis—including the promise of assistance in repurchasing their home, the promise to abate code enforcement fines, and the promise of repair resources—Plaintiffs:

> a. Paused legal actions they were considering against the City and law enforcement;
>
> b. Removed community barricades that had been erected to protect the Property;
>
> c. Invested time and resources in negotiations with the City and SEI.

Plaintiffs' cessation of legal actions and removal of community barricades in reliance on said promises is documented in email correspondence and photographs attached as **Exhibits L and CC**.

## C. SEI's Fraudulent Inducement and the "Meeting of the Minds" (March 2021)

64. By early 2021, Plaintiffs had viable legal claims against BCMC for authorizing the unlawful December 8, 2020 raid on the Adjacent Lot. These claims were pursued in Multnomah County Circuit Court Case No. 21CV04560. The docket in said case is attached as **Exhibit R**, demonstrating that said lawsuit was pending at the time of Defendants' representations.

65. On March 19, 2021, Plaintiffs met with SEI executives Tony Hopson and Libra Forde to discuss the proposed partnership. A recording and transcript of the March 19, 2021 meeting are attached as **Exhibit N**.

66. During this meeting, Libra Forde made two statements that are direct evidence of the conspiracy and its racial animus:

> a. First, Forde explicitly conditioned SEI's acceptance of the Adjacent Lot donation on Plaintiffs dismissing their lawsuit against BCMC: "...y'all gotta drop all this so the all the legal counsel been working through that narrative to try to get this transferred... We do not want to inherit any legal responsibilities." In said recording (**Exhibit N**), Forde explicitly conditioned SEI's acceptance of the Adjacent Lot donation on Plaintiffs dismissing their lawsuit against BCMC.
>
> b. Second, Forde articulated SEI's official policy of allocating housing resources based on race: SEI's resources for housing were reserved exclusively for individuals who "identify as Black or African American." SEI's "dollars don't fund other folks for housing." Non-Black individuals seeking assistance should be referred to Central City Concern.

67. Hopson and Forde fraudulently portrayed SEI as a neutral, charitable intermediary that would partner with Plaintiffs in a community development project on the land. Hopson promised that Plaintiffs would be "steering a community development project together"

Verified Correct Copy of Original 3/20/2026.

and that a room would be designated to memorialize the Kinney family. Said recording (**Exhibit N**) further documents these promises.

68. During the May 7, 2021 meeting, Forde instructed Plaintiffs to "keep in your back pocket the donation idea," referring to the scheme wherein the third-party owner would donate the Property to SEI, which would then transfer it to Plaintiffs. She explicitly described this as "leverage" to be used in negotiations, confirming that the "two-step" scheme was an active, ongoing strategy jointly managed by the City and SEI. Plaintiffs' contemporaneous notes and/or recording of the May 7, 2021 meeting are attached as **Exhibit O**.

## D. The Fraudulent Conveyance and Plaintiffs' Dismissal of Case No. 21CV04560

69. In reasonable and justifiable reliance on the representations made by City officials and SEI executives—including the promise of partnership, the promise of assistance in repurchasing their home, and the promise that SEI would act as a neutral, charitable intermediary—Plaintiffs agreed to dismiss their lawsuit against BCMC.

70. On or about October 1, 2021, BCMC transferred the Adjacent Lot to SEI by deed recorded as a "charitable donation" for nominal consideration of $1. A true and correct copy of said deed is attached as **Exhibit P**.

71. A contemporaneous valuation report confirms the fair market value of the lot at the time was $962,319. A true and correct copy of said valuation report is attached as **Exhibit Q**.

72. On or about March 11, 2022, an Order of Dismissal Without Prejudice was entered in Multnomah County Case No. 21CV04560, submitted by BCMC's counsel. Plaintiffs had dismissed their viable legal claims in direct reliance on SEI's fraudulent representations. A true and correct copy of said Order of Dismissal is attached as **Exhibit S**.

## E. The Coercive Repurchase and SEI's Ongoing Threats

73. In March 2022, the third-party owner offered to sell the Property back to Plaintiffs for $285,000. Plaintiffs accepted, forming a binding contract. A true and correct copy of the March 2022 purchase agreement is attached as **Exhibit T**.

74. The third-party owner breached this agreement. Under severe economic and emotional duress, Plaintiffs were forced to pay $345,643 in November 2023—$60,643 more than the agreed price—and to sign an unconscionable release of claims. A true and correct copy of the November 2023 closing documents demonstrating payment of $345,643 is attached as **Exhibit U**. A true and correct copy of the release of claims signed under duress is attached as **Exhibit V**.

## F. The Coerced Release: Void Ab Initio

75. The release of claims that Plaintiffs were forced to sign at the November 2023 closing (attached as **Exhibit V**) is void or voidable under Oregon law and does not bar any of the

Verified Correct Copy of Original 3/20/2026.

claims asserted in this Complaint. The release was procured through economic duress and fraud in the inducement.

76. **Economic Duress:** At the time of the November 2023 closing, Plaintiffs were under severe economic duress. They had been unlawfully displaced from their generational home for nearly three years. Their belongings remained in storage, incurring ongoing monthly costs exceeding $10,000. They faced imminent homelessness. The third-party owner (UHD) had breached the March 2022 purchase agreement and refused to close at the agreed-upon price of $285,000, leaving Plaintiffs with no reasonable alternative but to accept the unconscionable terms demanded.

77. Under Oregon law, a contract or release procured through economic duress is voidable. *See Oregon Stationers, Inc. v. Cline*, 139 Or. App. 19, 24 (1996) (duress exists where one party "by wrongful threats or conduct, overcomes the free will of the other party").

78. **Fraud in the Inducement:** The release was also procured through fraud in the inducement. At the time Plaintiffs signed the release, they were acting in reasonable and justifiable reliance on the ongoing fraudulent promises and representations made by Defendants City of Portland and SEI.

79. Specifically, City officials Diaz, Allen, and Dennis had promised in December 2020 that the City would assist Plaintiffs in repurchasing their home, abate code enforcement fines exceeding $60,000, and provide resources for repairs. SEI executives Hopson and Forde had promised in March and May 2021 that SEI would act as a neutral, charitable intermediary and that Plaintiffs would be partners in a community development project on the Adjacent Lot.

80. Critically, these promises were reaffirmed as recently as **March 2024**—four months after the release was signed—when City Defendants Robert Taylor, Tim Hicks, and planning official Donnie Olivera met with Plaintiffs to discuss potential development opportunities for the 4406 Property, creating a false impression of good faith and a continuing willingness to help Plaintiffs secure their equity and future. **(Exhibit AA)**

81. Under Oregon law, a release procured by fraud is voidable. *See ORS 71.1030* (good faith and fair dealing); *ORS 71.2010* (fraudulent inducement renders contract voidable). Plaintiffs would not have signed the release had they known the truth: that the City and SEI were secretly advancing a competing development scheme, that the promises of assistance were false, and that the fines would never be abated.

82. **The Release Does Not Bar Claims Arising After Its Signing:** Even if the release were valid—which it is not—it explicitly or implicitly applies only to claims arising on or before its execution in November 2023. The release does not, and cannot, bar claims arising from Defendants' conduct after that date.

83. Defendants' unlawful conduct has continued and intensified since the release was signed, including:

Verified Correct Copy of Original 3/20/2026.

a. The March 2024 bad-faith development discussions (**Exhibit AA**);

b. The April 2024 racially charged statement by SEI Executive Tony Hopson ("You serve your community and we'll serve ours") in the presence of City agent Tim Hicks (**Exhibit DDD**);

c. The November-December 2025 expedited zoning approval under SB 1537, processed despite Plaintiffs' written objections (**Exhibits BB and CC**);

d. The December 12, 2025 mediation, where City Attorney Taylor conditioned settlement on Plaintiffs abandoning their EPA complaint and refused to abate code enforcement fines (**Exhibit DD**);

e. The January 29, 2026 coercive purchase offer by City agent Tim Hicks (**Exhibit EE**);

f. The March 2, 2026 email from City Attorney Robert Taylor terminating negotiations, confirming the City has walked away from any resolution (**Exhibit C-1**).

84. These post-release overt acts are independently actionable and are not barred by any release signed in November 2023.

85. **The Release Does Not Bar Claims Against Co-Conspirators Not Party to the Release:** The November 2023 release was signed with UHD, the third-party owner of the Property. Neither the City of Portland nor SEI were parties to that release. Under well-settled principles of contract and tort law, a release of one party does not bar claims against co-conspirators who were not parties to the release. *See ORS 31.815* (release of one tortfeasor does not discharge others unless expressly provided).

86. **The Release is Itself an Injury Caused by the Conspiracy:** Finally, Plaintiffs expressly plead that the coerced release is not a waiver of claims, but rather **another injury** caused by the conspiracy. Defendants' coordinated campaign of unlawful evictions, false promises, fraudulent inducement, and economic pressure directly and proximately caused Plaintiffs to be in a position where they had no choice but to accept unconscionable terms and sign a release of claims.

87. The $60,643 overpayment that Plaintiffs were forced to pay—extracted through UHD's bad faith and breach of contract, and through the broader coercive environment created by all Defendants—is an element of damages, not a waiver of rights. Defendants cannot now use the very instrument of their wrongdoing as a shield against liability for that wrongdoing.

## G. The City's Ongoing Coercive Pressure (2024-2026)

88. In March 2024, City Defendants Robert Taylor (City Attorney), Tim Hicks (City-hired mediator), and planning official Donnie Olivera met with Plaintiffs to discuss potential development opportunities for the 4406 Property. These discussions created a false

impression of good faith and a willingness to help Plaintiffs secure their equity and future. The City officials offered no substantive follow-up or assistance, revealing the meetings as a tactic to stall Plaintiffs while the City advanced competing plans with SEI. Plaintiffs' contemporaneous notes from the March 2024 meeting are attached as **Exhibit AA**.

89. While these negotiations were pending, and despite Plaintiffs having filed formal written objections in November 2025 specifically contesting the fraudulent conveyance of the Adjacent Lot to SEI, the City of Portland's Bureau of Planning and Sustainability actively approved a zoning change for the Adjacent Lot at SEI's request. This approval was processed under the expedited provisions of Oregon Senate Bill 1537 (2024), which amended ORS 197.360-197.380. Plaintiffs' written objections to said zoning change, filed in November 2025, are attached as **Exhibit BB**. The City's approval of said zoning change is attached as **Exhibit CC**.

90. The use of SB 1537 allowed the City and SEI to circumvent standard zoning procedures, including the requirement for a Community Impact Statement under ORS 197.363, which would have mandated an assessment of the project's effects on adjacent homeowners like Plaintiffs.

91. The City's commitment to this joint enterprise with SEI was laid bare in the December 12, 2025 mediation attended by Plaintiffs, City Attorney Robert Taylor, and City agent Tim Hicks. During this mediation:

> a. Taylor explicitly conditioned the City's willingness to settle claims arising from the 2020 evictions upon Plaintiffs' withdrawal of their environmental (EPA) complaint against SEI's project on the Adjacent Lot, stating the goal was to "buy peace" for a "final resolution to all of this";
>
> b. Taylor threatened to abandon negotiations entirely because the EPA complaint created a "cloud over this whole thing," proving the City's interests were inseparable from SEI's development success;
>
> c. When Plaintiffs requested abatement of code enforcement fines—a specific promise made by City officials in 2020—Taylor refused, stating it would only be resolved in a global settlement.

Plaintiffs' contemporaneous notes from said mediation are attached as **Exhibit DD**.

92. These admissions confirm that the City's interests were legally and financially inseparable from SEI's development success, forming a unified objective in the conspiracy. Taylor's refusal to abate code enforcement fines confirmed that the fines were being used as coercive leverage to achieve the City's overarching goal: the removal of Plaintiffs as an obstacle to the consolidated redevelopment of the block, as envisioned in the Albina Plan. The City continues to withhold abatement of these fines today.

Verified Correct Copy of Original 3/20/2026.

Verified Correct Copy of Original 3/20/2026.

93. On January 29, 2026—less than 30 days before the initial filing of this Complaint in federal court—City agent Tim Hicks made a direct offer to purchase the Property at an "accelerated price" on behalf of the City. This high-pressure tactic was designed to overwhelm Plaintiffs and coerce a sale. Written communication from Tim Hicks containing said offer is attached as **Exhibit EE**.

94. On March 2, 2026, City Attorney Robert Taylor formally terminated all negotiations, stating in an email: "Thank you, William. At this point, the City is not interested in the approach you've outlined. At the conclusion of the mediation, the City believes the parties are too far apart to make continued negotiations useful." A true and correct copy of said email is attached as **Exhibit C-1**. With the termination of negotiations, Plaintiffs' only remaining avenue for redress is this lawsuit.

## H. SEI's Lowball Settlement Offer

95. Following the collapse of partnership talks, SEI, through Tony Hopson, made a formal settlement offer to Plaintiffs: $25,000 in exchange for a full release of all claims related to the Adjacent Lot. A true and correct copy of said settlement offer is attached as **Exhibit FF**.

96. This offer—grossly inadequate against a property valued at $962,319—constitutes an implied admission of potential liability and a coercive tactic designed to exploit Plaintiffs' financial distress.

## SECTION V: DIRECT EVIDENCE OF RACIAL ANIMUS

97. On March 19, 2021, as alleged above, SEI Executive Libra Forde stated that SEI's housing resources were reserved exclusively for individuals who "identify as Black or African American" and that SEI's "dollars don't fund other folks for housing." These statements are documented in the recording of the March 19, 2021 meeting attached as **Exhibit N**.

98. In April 2024, during a meeting attended by City agent Tim Hicks, SEI Executive Tony Hopson stated to Plaintiffs: "You serve your community and we'll serve ours." Plaintiffs' contemporaneous notes from the April 2024 meeting, attached as **Exhibit DDD**, document this statement and Hicks's failure to object.

99. This statement, made in the context of property disputes and development negotiations, explicitly framed the conflict as one between racial communities. City agent Tim Hicks did not object, disavow, or distance the City from this racial framing. Hicks's silence constituted ratification of SEI's racial animus.

100. These admissions are statements of SEI's core operational policy and demonstrate that the conspiracy operated within a racially discriminatory framework.

101. The City's disparate treatment of Plaintiffs compared to similarly situated white property owners further evidences discriminatory animus:

Verified Correct Copy of Original 3/20/2026.

a. White property owners with code violations of similar magnitude were routinely offered payment plans, compliance assistance, and extended deadlines. Plaintiffs were told by City Attorney Taylor that code enforcement fines would only be resolved as part of a "global settlement" requiring surrender of their property or claims.

b. White property owners seeking zoning changes for adjacent lots received full Community Impact Statements and standard procedural timelines. Only Plaintiffs—Black and Indigenous property owners standing in the way of SEI's development—were subjected to the expedited SB 1537 process that deliberately bypassed these safeguards.

## SECTION VI: WHEELER'S FALSE STATEMENTS AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

102.    In or about August 2020 and continuing thereafter, Defendant Ted Wheeler made repeated public statements falsely characterizing the Kinney family home at 4406 N. Mississippi Avenue as an "armed autonomous zone" and its occupants as dangerous criminals. These statements were widely disseminated through press conferences, media interviews, and official City communications.

103.    These statements were false. The Kinney home was not an armed autonomous zone, and its occupants posed no threat to public safety. Wheeler knew or should have known these statements were false, yet he made them with reckless disregard for the truth.

104.    It was reasonably foreseeable that publicly branding a family as dangerous criminals would expose them to harm, including discriminatory treatment by public and private actors who relied on Wheeler's characterization.

## SECTION VII: THE ALTER-EGO, SYMBIOTIC, AND JOINT ENTERPRISE RELATIONSHIP BETWEEN THE CITY AND SEI

105.    Defendant SEI functions as the alter-ego and de facto instrumentality of Defendant City of Portland for the implementation of redevelopment and displacement policies in North and Northeast Portland, particularly within the Albina district.

106.    **Financial Dominance and Dependence:** SEI's operational existence is underwritten by the City. It receives millions of dollars annually in direct grants, contracts, and fee-for-service payments from the City of Portland and its affiliated agencies (e.g., Prosper Portland, Portland Housing Bureau). Contracts and grant agreements between the City of Portland and SEI documenting this financial relationship are attached as **Exhibits EEE, FFF, GGG.**

107.    **Interlocking Leadership and Direction:** City officials and SEI executives coordinate strategy and operations at the highest levels. City policymakers, including the Mayor's Office, routinely direct, guide, and partner with SEI on community development

initiatives. SEI's actions, as alleged herein, were undertaken at the City's behest and with its active participation.

108.     **Instrumentality for Public Policy Goals:** The City and SEI have co-mingled resources, objectives, and personnel to execute the Albina Plan's goals, using SEI's private, non-profit form as a vehicle to accomplish public policy objectives—specifically, property acquisition and resident displacement—with reduced transparency and public oversight.

109.     The relationship between the City and SEI is "symbiotic," such that their conduct is "inextricably intertwined." The City benefits by using SEI to execute politically sensitive displacement and property acquisition strategies outside the strict confines of municipal law, procurement rules, and public scrutiny. SEI benefits by receiving massive, sustained public funding, enhanced political influence, and preferential access to development opportunities.

110.     Defendants City and SEI engaged in a "joint enterprise" with a shared, unlawful goal: the acquisition and control of the Kinney Property and Adjacent Lot for their mutual redevelopment benefit. They shared a common purpose and a community of interest in the venture's success.

111.     The City's use of SB 1537 to expedite zoning for the Adjacent Lot at SEI's request, while simultaneously maintaining the pretense of good-faith negotiations with Plaintiffs, demonstrates the depth of the City's commitment to SEI's development objectives. City Attorney Taylor's December 12, 2025 admission that the City's settlement offer was contingent on Plaintiffs abandoning opposition to SEI's project confirms that the City and SEI function as a single, unified enterprise with respect to the acquisition and redevelopment of the Kinney properties.

112.     The 1988 Comprehensive Planning Map (**Exhibit J**) and the ICURA Plan's express adoption of the Albina Community Plan as its "cornerstone" (**Exhibit HH**) confirm that the City's objective—the conversion of the Kinney property to commercial use—predates and animates the conspiracy with SEI. SEI's role as the City's alter-ego in acquiring the Adjacent Lot and pressuring Plaintiffs from their home is the contemporary execution of this decades-old policy.

## SECTION VIII: COMPLIANCE WITH OREGON TORT CLAIMS ACT

113.     Pursuant to the Oregon Tort Claims Act (OTCA), ORS 30.270 to 30.300, Plaintiffs have complied with all conditions precedent to the maintenance of this action against Defendant City of Portland and its officers, employees, and agents acting within the scope of their employment.

114.     On or about June 10, 2022, Plaintiffs served a written Tort Claim Notice upon the City of Portland's designated Risk Management Department by certified mail, return receipt requested. The notice set forth:

Verified Correct Copy of Original 3/20/2026.

Verified Correct Copy of Original 3/20/2026.

a. The names and addresses of the claimants and their authorized representatives;

b. A concise statement of the time, place, cause, and nature of the occurrence giving rise to the claim, specifically the unlawful December 8, 2020 raid on the Property and Adjacent Lot;

c. The amount of compensation and other relief demanded;

d. The names of the public bodies and employees alleged to have caused the loss or injury, including but not limited to the City of Portland, Portland Police Bureau, and named individual defendants.

A true and correct copy of said Tort Claim Notice, together with proof of service by certified mail, is attached as **Exhibit W**.

115.    The City of Portland acknowledged receipt of said notice on June 15, 2022, and assigned it City Claim Number 2020-011795-20. A true and correct copy of the City's written acknowledgment is attached as **Exhibit X**.

116.    The City of Portland did not reject the claim as untimely, did not request additional information regarding the claim's timeliness, and at all relevant times had actual knowledge of the time, place, and circumstances of the December 8, 2020 incident through its officers, agents, and employees who participated in or had knowledge of said incident. The City's acceptance, assignment of a claim number, and failure to object to timeliness constitutes a waiver of any defense based on the 180-day notice requirement.

117.    Plaintiffs have therefore fully exhausted their administrative remedies as required by ORS 30.275 for all state law tort claims asserted against Defendant City of Portland and its officers, employees, and agents acting within the scope of their employment.

118.    In the alternative, to the extent any claim is determined not to have been timely presented, the City of Portland had actual knowledge of the death, injury, and damage claimed within the 180-day period, and Plaintiffs are entitled to rely on the "actual knowledge" exception set forth in ORS 30.275(6). *See McCabe v. State of Oregon*, 314 Or. 605 (1992) (actual notice to a person responsible for administering claims is sufficient).

## SECTION IX: TOLLING OF STATUTES OF LIMITATIONS, FRAUDULENT CONCEALMENT, AND DELAYED DISCOVERY

119.    **Extended Timeline of the Conspiracy:** The unlawful conduct complained of arises from a decades-long conspiracy. While certain discrete acts occurred outside typical limitations periods, the conspiracy itself—and the actionable harm to Plaintiffs—is ongoing. Under Oregon law, where there is a continuing tort, the statute of limitations runs from the last overt act. *Holdner v. Columbia County*, 51 Or App 605, 627 P2d 4 (1981) (continuing tort alleged where damage occurred "from time to time" beginning in 1974 and thereafter). The overt acts alleged herein, including coercive purchase offers by Tim Hicks (January 29, 2026), the termination of negotiations by Robert Taylor (March

2, 2026), and the weaponization of code enforcement, are part of the same continuing tort.

120.     **Fraudulent Concealment Doctrine:** Under Oregon law, the statute of limitations is tolled where a defendant takes affirmative steps to conceal the cause of action. *See ORS 12.040(4)* (in a suit upon fraud or mistake, the limitation shall only be deemed to commence from the discovery of the fraud or mistake). Defendants' affirmative misrepresentations—including the false promises of aid, the fraudulent inducement to drop the lawsuit, and the bad-faith development discussions—concealed the existence of the conspiracy and prevented Plaintiffs from timely asserting their claims.

121.     **Delayed Discovery:** Plaintiffs could not have reasonably discovered the full extent of the conspiracy until the triggering events of late 2025 and early 2026, including:

a. December 12, 2025 mediation, where City Attorney Taylor admitted the City's interests were inseparable from SEI's;

b. Discovery of the expedited zoning approval under SB 1537;

c. January 29, 2026 coercive purchase offer;

d. March 2, 2026 termination of negotiations by City Attorney Taylor.

122.     **ORCP 21 D Limitations:** Plaintiffs reserve the right to respond to any statute of limitations defense by demonstrating that the limitations period was tolled by Defendants' fraudulent concealment and that the continuing nature of the tort renders the entire course of conduct actionable.

## PLAINTIFF-SPECIFIC INJURIES — STANDING AND DAMAGES

123.     Each named Plaintiff has suffered distinct and concrete injuries as a direct and proximate result of Defendants' unlawful conduct. These injuries establish each Plaintiff's standing to bring the claims asserted herein and form the basis for individual damages awards. The injuries alleged herein are documented in the exhibits attached hereto, including but not limited to Exhibits B, C, D, E, F, G, H, U, Y, and Z.

### 1. Plaintiff William X Nietzche (aka William Kinney III)

124.     **Unlawful Arrests and Detention:** Plaintiff William X Nietzche was unlawfully arrested and detained during the September 9, 2020 raid on the Kinney Property. He was again unlawfully arrested and detained during the December 8, 2020 raid. These arrests were conducted by Defendants MCSO, PPB, and Deputy John Pemberton, acting under color of state law and in violation of Oregon's COVID-19 eviction moratorium, as documented in incident reports attached as **Exhibits B and D.**

125.     **Loss of Personal Property:** During the December 8, 2020 raid, Defendants PPB and MCSO officers destroyed or caused the loss of Plaintiff Nietzche's personal property

_Verified Correct Copy of Original 3/20/2026._

_Verified Correct Copy of Original 3/20/2026._

(valued over $10,000), including his wedding ring, which was lost during the raid and has never been recovered. A photograph of Plaintiff Nietzche's wedding ring is attached as **Exhibit G**.

126.    **Emotional Distress:** Plaintiff Nietzche has suffered severe emotional distress, including trauma from being unlawfully arrested, detained, and forcibly removed from his family's generational home, and from the loss of irreplaceable personal property.

## 2. Plaintiff Julie Ann Metcalf Kinney

127.    **Forced Removal at Gunpoint (September 9, 2020):** During the September 9, 2020 eviction, Defendant Deputy John Pemberton and other officers forced Plaintiff Julie Ann Metcalf Kinney, at gunpoint, to hurriedly gather and remove personal items from the Property while other family members were detained, as documented in **Exhibit B**.

128.    **Destruction of Sacred Native American Necklace:** During the December 8, 2020 raid, Defendants PPB and MCSO officers destroyed a sacred Native American crystal necklace that held deep religious and familial significance to Plaintiff Julie Ann Metcalf Kinney and her late Native American grandmother. A photograph of said sacred necklace taken before its destruction is attached as **Exhibit F**.

129.    **Storage Costs:** As a direct result of Defendants' unlawful displacement, the Kinney family was forced to place their salvaged belongings into three separate storage units, incurring over $10,000 in storage costs over four years. Storage facility receipts are attached as **Exhibit H**.

130.    **Reliance on False Promises:** In reasonable reliance on specific promises made by City officials Sam Diaz, Seraphie Allen, and Kristen Dennis to provide resources for repairs and abate code enforcement fines, Plaintiff Kinney deferred undertaking major repairs on her own and paused legal actions. The City's subsequent breach of these promises has left her living in unsafe, unhealthy, and emotionally distressing conditions. City communications containing said promises are attached as **Exhibit L**.

## 3. Plaintiff Michele Metcalf

131.    **Out-of-State Travel and Lost Wages:** Although residing out of state during the events in question, Plaintiff Michele Metcalf incurred significant travel expenses and lost wages traveling to Portland to support her family during the crisis caused by Defendants' unlawful evictions.

132.    **Vehicle Vandalism and Stolen Property:** In December 2020, Plaintiff Metcalf's vehicle was vandalized, and irreplaceable items were stolen. City and police officials promised Plaintiff Metcalf they would investigate the vandalism and help recover the stolen items. The City failed to provide restitution or investigation.

133.    **Emotional Distress:** Plaintiff Metcalf has suffered severe emotional distress from the destruction of her family's home, the loss of family heirlooms, and the City's broken promises to investigate.

Verified Correct Copy of Original 3/20/2026

### 4. Plaintiff Michael Kinney

134.    **Unlawful Arrests (Three Occasions):** Plaintiff Michael Kinney was unlawfully arrested on three separate occasions:

> a. September 9, 2020 — during the initial unlawful eviction raid, as documented in **Exhibit B**;
>
> b. November 5, 2020 — during a pretextual traffic stop by Portland Police;
>
> c. December 8, 2020 — during the second unlawful raid, as documented in **Exhibit D**.

135.    **Held at Gunpoint:** During the September 9, 2020 raid, Plaintiff Kinney was held at gunpoint by Defendant Deputy John Pemberton and other officers, as documented in **Exhibit B**.

136.    **Damage to Personal Property:** Plaintiff Kinney's personal property was damaged during the December 8, 2020 raid, when officers used excessive force and destroyed Plaintiffs' belongings valued over $5,000. Photographs documenting the destruction are attached as **Exhibit E**.

137.    **Reputational Harm:** As a direct result of Defendant Mayor Ted Wheeler's false and defamatory statements labeling the Kinney Property an "armed autonomous zone" and its occupants as weapons-stockpiling dangers, Plaintiff Kinney has suffered reputational harm in the community.

### 5. Plaintiff Estate of William Kinney Jr.

138.    **Wrongful Death:** Plaintiff Estate of William Kinney Jr., by and through its Personal Representative Julie Ann Metcalf Kinney, brings claims for the wrongful death of William Kinney Jr., which was directly and proximately caused by Defendants' conduct.

139.    **Medical Negligence and Discriminatory Treatment:** In August 2022, William Kinney Jr. suffered a cranial stroke while at Legacy Emanuel Hospital. The on-call stroke physician, acting through a telehealth system, negligently directed hospital staff to administer stroke medication without conducting the necessary, immediate in-person neurological examination required by the standard of care. This critical delay and improper treatment modality constituted medical negligence. Later that morning, William Kinney Jr. was found to have suffered catastrophic brain damage and was declared brain dead. Medical records from Legacy Emanuel Hospital are attached as **Exhibit Z**.

140.    **Causal Connection to Defendants' Conduct:** The severe stress, trauma, and instability caused by Defendants' unlawful evictions, displacement, and ongoing coercive pressure directly and proximately exacerbated the health of William Kinney Jr., contributing to his physical decline and making him more vulnerable to medical crisis.

_Verified Correct Copy of Original 3/20/2026._

## 6. Collective and Derivative Injuries

141.     **Loss of Generational Home:** All Plaintiffs have suffered the loss of their generational home as a physical, emotional, and cultural anchor.

142.     **Costs of Repurchase Under Duress:** In November 2023, under severe economic and emotional duress, Plaintiffs were forced to pay UHD $345,643 to repurchase their own home—$60,643 more than the agreed price of $285,000—and to sign an unconscionable release of claims. Closing documents demonstrating payment of $345,643 are attached as **Exhibit U**. The release signed under duress is attached as **Exhibit V**.

143.     **Ongoing Uninhabitable Conditions:** Having repurchased their home, Plaintiffs have been forced to live in the dilapidated Property, which remains in a severe state of disrepair due to the damage inflicted by Defendants during the unlawful raids.

---

**FIRST CLAIM FOR RELIEF**
**Negligence and Gross Negligence**
(Against All Defendants)

144.     Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 27-42, 45-57, 58-96, 105-112, 113-118, 124-143, and Exhibits A through GGG.**

145.     Defendants owed a duty to Plaintiffs to exercise reasonable care in the execution of their official duties and in their interactions with Plaintiffs.

146.     **Breach by City of Portland and its officers/agents (Diaz, Allen, Dennis, Taylor, Hicks, PPB, MCSO, Pemberton):**

a. Executing evictions in violation of Oregon's COVID-19 eviction moratorium (HB 4213);

b. Using excessive and unnecessary force during said evictions;

c. Destroying Plaintiffs' personal property;

d. Failing to abate code enforcement fines despite repeated promises;

e. Failing to provide promised repair resources;

f. Using code enforcement fines as coercive leverage.

147.     **Breach by SEI and its officers/agents (Hopson, Forde):**

a. Making promises of partnership with no intention of fulfilling them;

b. Negligently misrepresenting SEI's role as a neutral, charitable intermediary;

Verified Correct Copy of Original 3/20/2026._

c. Inducing Plaintiffs to dismiss their lawsuit against BCMC through false promises.

148.    As a direct and proximate result of Defendants' breaches, Plaintiffs suffered damages including displacement, property destruction, storage costs, overpayment of $60,643, and severe emotional distress.

149.    Defendants' conduct was so reckless and characterized by a conscious indifference to the rights and safety of Plaintiffs as to constitute gross negligence.

---

## SECOND CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress**
(Against All Defendants)

150.    Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 45-57, 58-96, 97-101, 102-104, 124-143, and Exhibits B, D, E, F, G, N, O, DD, EE, C-1, DDD.**

151.    Under Oregon law, a claim for intentional infliction of emotional distress requires: (1) defendants intended to inflict severe emotional distress on plaintiffs; (2) defendants' conduct did, in fact, cause plaintiffs to suffer severe emotional distress; and (3) defendants' conduct involved an extraordinary transgression of the bounds of socially tolerable conduct. *Lathrope-Olson v. Dept. of Transportation*, 128 Or. App. 405, 408, 877 P.2d 89 (1994) .

152.    Defendants' conduct, as alleged herein, was extreme and outrageous, exceeding the bounds of social toleration.

153.    Defendants intended to cause severe emotional distress to Plaintiffs, or acted with reckless indifference to the high probability that severe emotional distress would result.

154.    Specific outrageous conduct includes:

a. Unlawful armed evictions in violation of a statewide moratorium;

b. Holding family members at gunpoint;

c. Destroying a sacred Native American necklace;

d. Making false promises of assistance to induce Plaintiffs to dismiss their lawsuit;

e. Publicly branding the family as dangerous criminals;

f. Using code enforcement fines as coercive leverage;

g. Threatening hostile development to render the home unlivable.

155.    As a direct and proximate result, Plaintiffs have suffered severe emotional distress.

## THIRD CLAIM FOR RELIEF
**Trespass to Land and Chattels**
(Against City of Portland, PPB, MCSO, Pemberton)

156.    Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 45-57, 124-143, and Exhibits B, C, D, E, F, G, H, I.**

157.    Defendants intentionally entered Plaintiffs' Property and the Adjacent Lot without lawful authority.

158.    The September 9 and December 8, 2020 evictions were conducted in violation of the eviction moratorium and therefore without legal justification.

159.    Defendants intentionally interfered with Plaintiffs' personal property, destroying items valued at over $10,000.

160.    As a direct and proximate result, Plaintiffs suffered damages including the cost of repair and replacement of personal property.

## FOURTH CLAIM FOR RELIEF
**Conversion**
(Against City of Portland, PPB, MCSO, Pemberton)

161.    Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 45-57, 124-143, and Exhibits B, D, E, F, G.**

162.    Defendants intentionally and wrongfully exercised dominion and control over Plaintiffs' personal property, including but not limited to the sacred Native American necklace and wedding ring.

163.    Defendants' actions permanently deprived Plaintiffs of their property.

164.    As a direct and proximate result, Plaintiffs suffered damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
**Fraud and Fraudulent Inducement**
(Against City of Portland, SEI, Diaz, Allen, Dennis, Hopson, Forde)

165.    Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 58-96, 97-101, 105-112, 124-143, and Exhibits L, M, N, O, P, Q, R, S, AA, DD, EE, C-1, DDD.**

166.    Defendants made false representations of material fact to Plaintiffs, including:

    a. Promises to assist in repurchasing their home;

    b. Promises to abate code enforcement fines;

    c. Promises to provide repair resources;

    d. Promises of partnership in a community development project;

    e. Representations that SEI would act as a neutral, charitable intermediary.

167.    Defendants knew these representations were false at the time they were made, or made them recklessly without knowledge of their truth.

168.    Defendants intended that Plaintiffs rely on these representations.

169.    Plaintiffs reasonably and justifiably relied on these representations to their detriment, including by:

    a. Dismissing their lawsuit against BCMC (Case No. 21CV04560);

    b. Pausing legal actions against the City;

    c. Removing community barricades;

    d. Investing time and resources in negotiations.

170.    As a direct and proximate result, Plaintiffs suffered damages, including the loss of the Adjacent Lot (valued at $962,319), overpayment of $60,643, and ongoing uninhabitable living conditions.

## SIXTH CLAIM FOR RELIEF
### Civil Conspiracy
(Against All Defendants)

171.    Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 27-42, 43-44 (for context and intent only), 58-96, 97-101, 105-112, 124-143, and Exhibits L, M, N, O, P, Q, R, S, AA, BB, CC, DD, EE, FF, C-1, DDD, EEE, FFF, GGG, HH, II, J.**

172.    Under Oregon law, a civil conspiracy requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *Yanney v. Koehler*, 147 Or. App. 269, 279, 935 P.2d 1235 (1997) .

173.    Defendants entered into an agreement to accomplish an unlawful purpose: to deprive Plaintiffs of their property rights in the Kinney Property and Adjacent Lot.

174.    Defendants committed overt acts in furtherance of the conspiracy, as alleged throughout this Complaint.

175.    The conspiracy was motivated, in part, by discriminatory animus against Plaintiffs as Black and Indigenous individuals, as evidenced by SEI's race-based housing policy and statements by Hopson and Forde.

176.    As a direct and proximate result, Plaintiffs suffered damages as alleged herein.

## SEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**
(Against City of Portland and SEI)

177.    Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 27-42, 58-96, 105-112, and Exhibits P, Q, AA1, AA2, AA3, HH.**

178.    Under Oregon law, unjust enrichment requires: (1) a benefit conferred; (2) awareness by the recipient that she has received the benefit; and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it. *Cron v. Zimmer*, 255 Or. App. 114, 130, 296 P.3d 567 (2013) .

179.    SEI received the Adjacent Lot, valued at $962,319, for nominal consideration of $1. This transfer occurred directly as a result of Plaintiffs' dismissal of their lawsuit against BCMC, which was induced by SEI's fraudulent representations.

180.    The City of Portland receives and continues to receive ongoing financial benefits from Tax Increment Financing (TIF) revenues generated within the ICURA, a portion of which is directly attributable to the displacement of original landowners like Plaintiffs.

181.    Defendants were aware that they received these benefits at Plaintiffs' expense.

182.    It would be inequitable to allow Defendants to retain these benefits without paying financial restitution to Plaintiffs.

## EIGHTH CLAIM FOR RELIEF
**Constructive Trust**
(Against SEI)

183.    Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 58-72, 75-87, and Exhibits N, O, P, Q, R, S.**

184.    Under Oregon law, a constructive trust requires: (1) property that rightfully belongs to plaintiff was taken or obtained by another under wrongful or inequitable circumstances; (2) the person who now possesses the property is not a bona fide

purchaser for value and without notice; and (3) by strong, clear and convincing evidence, the property in the hands of that person is the very property that rightfully belongs to plaintiff. *Tupper v. Roan*, 349 Or. 211, 223, 243 P.3d 50 (2010) .

185.    Plaintiffs had a valuable, pending equitable interest in the Adjacent Lot through the prosecution of Multnomah County Circuit Court Case No. 21CV04560 against BCMC Properties LLC.

186.    On March 19, 2021, and continuing thereafter, Defendants SEI, Tony Hopson, and Libra Forde fraudulently induced Plaintiffs to dismiss Case No. 21CV04560 by making false promises and representations.

187.    In reasonable and justifiable reliance on SEI's fraudulent representations, Plaintiffs dismissed Case No. 21CV04560. On or about March 11, 2022, an Order of Dismissal Without Prejudice was entered (**Exhibit S**).

188.    On or about October 1, 2021—**while Case No. 21CV04560 was still pending**— BCMC transferred the Adjacent Lot to SEI for nominal consideration of $1 (**Exhibit P**). The fair market value at the time of transfer was $962,319 (**Exhibit Q**).

189.    SEI had actual knowledge of Plaintiffs' pending lawsuit and expressly conditioned its acceptance of the donation on Plaintiffs dismissing that lawsuit. SEI therefore acquired the Adjacent Lot subject to any claims Plaintiffs could have asserted against BCMC. *See Marshall v. Holladay*, 293 Or. 241, 246 (1982) (one who acquires property with actual knowledge of pending litigation takes subject to the outcome).

190.    SEI's fraudulent conduct directly resulted in its acquisition of the Adjacent Lot free and clear of Plaintiffs' claims. SEI has been unjustly enriched, holding legal title to property valued at $962,319 which it acquired for $1.

191.    Plaintiffs request imposition of a constructive trust upon the Adjacent Lot located at 4424 N. Mississippi Avenue, now held by Defendant SEI.

---

## NINTH CLAIM FOR RELIEF
### Nuisance — Public and Private
(Against SEI and City of Portland)

192.    Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 73-74, 88-96, and Exhibits AA, BB, CC, DD, EE, FF, C-1.**

193.    SEI's ongoing threat to build a five-story development on the Adjacent Lot with the specific intent to render the Property unlivable constitutes an intentional and unreasonable continuing interference with Plaintiffs' use and enjoyment of their property (private nuisance).

194.     This threatened development, combined with the City's active coordination with SEI and its ongoing refusal to abate code enforcement fines, creates a public nuisance by interfering with the rights common to the general public to safe and habitable neighborhoods.

195.     The City's approval of expedited zoning for the Adjacent Lot under SB 1537, with knowledge that such development would render the Property unlivable, constitutes an affirmative act creating and maintaining a nuisance, as documented by the approval attached as **Exhibit CC**.

196.     The nuisance is ongoing and continuing. SEI continues to hold the Adjacent Lot and has received expedited zoning approval. The City continues to withhold abatement of code enforcement fines.

197.     Plaintiffs have suffered special injury, different from the public at large, as the owners of the property directly adjacent to the threatened development.

---

## TENTH CLAIM FOR RELIEF
### Wrongful Death
(On Behalf of the Estate of William Kinney Jr. Against City of Portland and SEI)

198.     Plaintiffs reallege and incorporate by reference the allegations contained in the following paragraphs of this Complaint as if fully set forth herein: **1-5, 45-57, 58-96, 124-143, and Exhibits B, D, E, F, G, H, U, V, Y, Z.**

199.     Under ORS 30.020, the personal representative of a decedent may maintain an action for wrongful death against a person who wrongfully caused the death of the decedent.

200.     The severe stress, trauma, and instability caused by Defendants' unlawful evictions, displacement, and ongoing coercive pressure directly and proximately exacerbated the health of William Kinney Jr., contributing to his physical decline and making him more vulnerable to medical crisis.

201.     In August 2022, William Kinney Jr. suffered a cranial stroke. The on-call stroke physician negligently directed hospital staff to administer stroke medication without conducting the necessary, immediate in-person neurological examination, causing catastrophic brain damage and subsequent death.

202.     The wrongful death of William Kinney Jr. was a foreseeable consequence of the physical and emotional devastation wrought by Defendants' conduct.

203.     As a result, the Estate of William Kinney Jr. and his survivors have suffered:

a. Loss of life;

b. Loss of companionship, society, and support;

c. Medical and funeral expenses;

d. Severe emotional distress to survivors;

e. All damages recoverable under Oregon's wrongful death statute, ORS 30.020.

---

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

## A. INJUNCTIVE RELIEF

1. **Permanent Injunction Against Hostile Development** – Enjoining SEI from constructing any structure on the Adjacent Lot that exceeds one story or would render the Property uninhabitable, and enjoining the City from issuing permits facilitating such development.

2. **Mandatory Injunction** – Ordering the City of Portland to abate all code enforcement fines accrued against the Property from September 9, 2020 through the present.

## B. CONSTRUCTIVE TRUST

3. Imposition of a constructive trust upon the Adjacent Lot at 4424 N. Mississippi Avenue, ordering SEI to transfer legal title to Plaintiffs, or in the alternative, payment of $962,319.00 representing the fair market value as of October 1, 2021.

## C. COMPENSATORY DAMAGES

4. Storage Costs: $10,000+ incurred by Plaintiffs.

5. Excess Purchase Price: $60,643 paid above the agreed-upon price.

6. Lost Wages and Travel Expenses: incurred by Plaintiff Michele Metcalf.

7. Property Destruction: Value of personal property destroyed, including the sacred Native American necklace and wedding ring.

8. Non-Economic Damages: Emotional distress and loss of enjoyment of life in an amount to be proven at trial, subject to the limitations of ORS 31.710.

9. Wrongful Death Damages: As recoverable under ORS 30.020, including economic and noneconomic damages subject to ORS 31.710.

## D. PUNITIVE DAMAGES

10. Punitive damages against Defendants in their individual capacities for malicious, wanton, and reckless conduct.

Verified Correct Copy of Original 3/20/2026.

## E. ATTORNEY'S FEES AND COSTS

11. Reasonable attorney's fees and costs pursuant to ORS 20.080 and any other applicable statute.

## F. PREJUDGMENT AND POST-JUDGMENT INTEREST

12. Prejudgment interest on all economic damages and post-judgment interest as provided by law.

## G. DECLARATORY RELIEF

13. A declaratory judgment that Defendants' conduct violated Plaintiffs' rights under Oregon common law and statutes.

## H. SUCH OTHER RELIEF as the Court deems just and proper.

---

## DEMAND FOR JURY TRIAL

Pursuant to ORCP 58, Plaintiffs demand a trial by jury on all issues triable as of right.

DATED this _19_ day of _March_, 2026.

Respectfully submitted,

_[signature]_ UCC 1-319

William X Nietzche [aka William Kinney III], Plaintiff Pro Se
c/o P.O. Box 12005
Portland, Oregon [97212]
w.nietzche1@gmail.com

_[signature]_ Kinney All Rights Reserved

Julie Ann Metcalf Kinney, Plaintiff Pro Se
c/o P.O. Box 12005
Portland, Oregon [97212]

---

## VERIFICATION

We, William X Nietzche [aka William Kinney III] and Julie Ann Metcalf Kinney, verify under oath that:

1)      We have reviewed the complaint;
2)      We have personal knowledge of the facts contained herein and believe them to be true;
3)      The allegations of which we do not have personal knowledge, we believe them to be true based on specified information, documents or both.

_[signature]_ UCC c-319

William Kinney III

_[signature]_ Kinney All Rights Reserved

Julie Ann Metcalf Kinney

[State of OREGON]

County of Multnomah

Signed and sworn to (or affirmed) before me on (date) March 19 , 20 26 . by
(name(s) of individuals making statement) William Kinney II and Julie Ann Kinney Metcalf Kinney

_____  Notary Public – [State of Oregon]  Official **Stamp**

OFFICIAL STAMP
MADISON MICHELLE LOPEZ
NOTARY PUBLIC - OREGON
COMMISSION NO. 1052132
MY COMMISSION EXPIRES SEPTEMBER 22, 2028

OFFICIAL STAMP
MADISON MICHELLE LOPEZ
NOTARY PUBLIC - OREGON
COMMISSION NO. 1052132
MY COMMISSION EXPIRES SEPTEMBER 22, 2028

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of March, 2026, I served a true and correct copy of the foregoing Complaint upon the following Defendants by [ ] U.S. Mail [ ] Hand Delivery [ ] Electronic Filing:

City of Portland
c/o City Attorney's Office
1221 SW 4th Avenue, Suite 430
Portland, OR 97204

Multnomah County Sheriff's Office
c/o Multnomah County Attorney's Office
501 SE Hawthorne Blvd., Suite 500
Portland, OR 97214

Self Enhancement, Inc.
c/o Registered Agent
3920 N. Kerby Avenue
Portland, OR 97227

[Additional individual Defendants to be served upon filing]

_____
William X Nietzche [aka William Kinney III]

_____

_Verified Correct Copy of Original 3/20/2026._

# EXHIBIT INDEX

(Nietzche,et. al. v. City of Portland, et. al. - VERIFIED COMPLAINT)

| Exhibit | Description |
|---------|-------------|
| A | Tribal Enrollment Cards |
| B | Incident Report (September 9, 2020) |
| C | Photographs of Door Damage |
| C-1 | March 2, 2026 Email from Robert Taylor |
| D | Incident Report (December 8, 2020) |
| E | Photographs of Property Destruction |
| F | Photograph of Sacred Necklace |
| G | Photograph of Wedding Ring |
| H | Storage Receipts |
| I | Written Permission from BCMC |
| J | 1988 Albina Plan & Map |
| L | City Communications (Diaz emails) |
| M | Meeting Notes (December 11, 2020) |
| N | Recording/Transcript (March 19, 2021) |
| O | Notes/Recording (May 7, 2021) |

_Verified Correct Copy of Original 3/20/2026._

| Exhibit | Description |
|---------|-------------|
| P | Deed to SEI (Oct 1, 2021) |
| Q | Valuation Report ($962,319) |
| R | Docket, Case No. 21CV04560 |
| S | Order of Dismissal (March 11, 2022) |
| T | March 2022 Purchase Agreement |
| U | November 2023 Closing Documents |
| V | Coerced Release |
| W | Tort Claim Notice (June 10, 2022) |
| X | City Acknowledgment |
| Y | [Reserved] |
| Z | Medical Records |
| AA | March 2024 Meeting Notes |
| BB | November 2025 Written Objections |
| CC | City Zoning Approval |
| DD | December 12, 2025 Mediation Notes |
| EE | January 29, 2026 Purchase Offer |

_Verified Correct Copy of Original 3/20/2026._

| Exhibit | Description |
|---------|-------------|
| FF | SEI $25,000 Settlement Offer |
| HH | ICURA Plan Excerpts |
| II | 1993 Albina Community Plan Excerpts |
| DDD | April 2024 Meeting Notes (Hopson statement) |
| EEE | City-SEI Contract/Grant (1) |
| FFF | City-SEI Contract/Grant (2) |
| GGG | City-SEI Contract/Grant (3) |
| AA1 | Ordinance [XXXX] (June 13, 2018) |
| AA2 | Ordinance [XXXX] (Dec 16, 2020) |
| AA3 | Ordinance (Jan 2021) |
| BB1 | Eviction Moratorium (HB 4213) |
| BB2 | Writ of Restitution |